J-S18006-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF A.K.L, A MINOR | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF D.D.L., FATHER | | |
| | | No. 334 MDA 2022 |

Appeal from the Decree Entered January 27, 2022
In the Court of Common Pleas of Lancaster County Orphans' Court at
No(s):  2021-00490

BEFORE:  BENDER, P.J.E., McLAUGHLIN, J., and McCAFFERY, J.

MEMORANDUM BY BENDER, P.J.E.:          **FILED: SEPTEMBER 16, 2022**

D.D.L. ("Father") appeals from the decree entered on January 27, 2022, which granted Mother's petition for involuntary termination of Father's parental rights to his minor son, A.K.L. ("Child"), pursuant to sections 2511(a)(1) and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.  After careful review, we affirm.

We glean the following facts and procedural history from the record. Mother and Father were married in June of 2014 and separated in June of 2017.  They are the natural parents of Child, who was born in August of 2016. During their marriage, Mother and Father resided in Florida.  Shortly after their separation, Mother moved to York, Pennsylvania.  On August 22, 2019, Mother remarried and moved to Elizabethtown in Lancaster County,

Pennsylvania, with her new husband.[1]  Mother and Stepfather had a child, A.B.M., together in November of 2020.  Father is not a United States citizen, and since separation from Mother, he has resided primarily with his mother ("Paternal Grandmother") in Whitby, Ontario, Canada.  Father is currently engaged to B.B. ("Father's Fiancé").

After their separation in 2017, Father threatened Mother that he would take Child and Mother would never see Child again.  In response to Father's threat, Mother immediately filed an emergency petition for custody of Child in York, Pennsylvania.  A few months later, Father traveled to York to see Child, and he was served with the custody complaint.  On April 13, 2018, after Father's participation in the court proceedings regarding the custody action, a stipulated custody order was entered by the York County Court of Common Pleas.  The custody order granted Father partial physical custody of Child one week per month in Canada with Mother present.

On February 23, 2021, Mother filed a petition for adoption and involuntary termination of Father's parental rights.  Hearings were held on August 23, 2021, and October 25, 2021, at which Mother, Stepfather, Father, Father's Fiancé, Paternal Grandmother, I.L. ("Paternal Great-Grandfather"), and Robert Cronin, Esquire, the court-appointed guardian *ad litem* ("GAL") testified.  Based on the foregoing testimony and the evidence produced at the hearings, the orphans' court made the following additional findings of fact:

---

[1] We refer to Mother's spouse herein as "Stepfather."

Father saw … Child during visits in Canada. The traveling time between Mother's residence and Paternal Grandmother's residence is about seven hours by automobile. When Mother brought … Child to Canada for Father's periods of partial physical custody, Mother and … Child stayed at Paternal [Great-] Grandfather's residence and Father stayed at Paternal Grandmother's residence. Father's Fiancé was present for Father's periods of partial physical custody of … Child. Father had no in-person visitation or contact with … Child from October 2017 until March 31, 2018, despite the fact there was a stipulated custody order in effect.[2] Father saw … Child in April and May of 2018. In July of 2018, Mother and Father agreed that Father's periods of partial physical custody would alternate between Mother coming to Canada with … Child and Father coming to Pennsylvania to visit … Child. Father saw … Child in August, September, and December of 2018. None of these periods of partial physical custody for Father were overnights with … Child[,] and the periods were for a duration of four to six hours. Mother spent every overnight with … Child[,] and … Child was never with Father [overnight] when Mother and … Child were in Canada to facilitate Father['s] seeing … Child. Father never had a period of partial physical custody of … Child for a full week. The longest period was for three days and that only occurred one time. Father did not engage … Child during his periods of partial physical custody but[,] rather[, he] permitted … Child to be around him. During Mother and … Child's visits to Canada, Father made no real effort to connect with … Child. During Mother and … Child's visits to Canada, Father did not bother to see … Child until 4:00 p.m. or 5:00 p.m.[,] and then he would have dinner with … Child and maybe engage in an activity. There were also times when Father was not present for dinner.

From January 2019 through July 2019, Father had no in-person visits with … Child. Father did have FaceTime calls twice a week with … Child. In August of 2019, Mother and Stepfather discussed with Father the idea of Stepfather['s] adopting … Child. Father initially agreed, but then Father reconsidered and would not consent. At that time (August of 2019), Father told Mother that if she got married tomorrow, Stepfather could adopt … Child.

_____

[2] Mother and Father entered a joint stipulation regarding the custody of Child on October 30, 2017. **See** N.T. Hearing, 8/23/21, at 234 (Father's acknowledging his signing of an initial custody agreement, which was approved by the orphans' court on October 30, 2017).

Father changed his mind about relinquishing his parental rights because he did not realize his rights would be terminated. Father had suggested to Mother that he would come to Pennsylvania for the month of September 2019 to see … Child[,] because he was going to be in Antigua for the winter months. Father never followed through with coming to Pennsylvania for the month of September 2019. From September 2019 through November 2019, there was no in-person contact between Father and … Child. The most recent in-person contact between Father and … Child occurred on December 31, 2019. FaceTime calls between Father and … Child occurred inconsistently two times per week until February 2020, at which time Mother and Father agree[d] to reduce the FaceTime calls to once per week. [] Child did not understand the purpose of the FaceTime contact with Father. Mother and Stepfather tried to make … Child feel comfortable to engage in the FaceTime calls, but their efforts usually did not work. During the FaceTime contact, Father would talk "baby talk" to … Child or turn the phone camera to the television to engage … Child. [] Child never knew who the person on the other end of the call was during his FaceTime sessions with Father. In July of 2020, Mother and Father agreed to end FaceTime contact due to Father's sporadic involvement. Instead, Mother agreed that going forward, Mother would send Father monthly written updates regarding … Child. Father agreed with Mother's request to stop FaceTime contact between Father and … Child in August of 2021[,] because … Child was hysterical. Mother is consistent in emailing monthly updates to Father about … Child. Father has never responded to the monthly updates Mother sends to him with any questions about … Child. Mother has always shared legal custody information about … Child with Father.

In August of 2020, Father announced to Mother that he would be coming to see … Child for … Child's birthday. Mother made a dinner reservation for the August 2020 visit for … Child's birthday to include Father, but Father failed to appear. Father failed to come to Pennsylvania for … Child's birthday in August 2020[,] because, according to Father, the border authorities in Canada would not permit him entry into the United States … due to Covid restrictions. If there is a child custody order and one must cross the U.S.-Canadian border to effectuate periods of physical custody, an individual was at all times permitted to cross the

- 4 -

border during Covid restrictions….[3]  Father could have gotten a flight to Washington D.C. for $350 to come for the August 2020 birthday visit.[4]    [Instead,] Father sent a package full of inexpensive party favors for … Child's birthday.  Father decided to attempt to fly to Pennsylvania from Antigua in December 2020.  However, due to Covid restrictions, Father was unable to fly to Pennsylvania in December 2020.  Father had no contact with … Child for Christmas 2020….

Father did not attempt to book any flights to see … Child from March of 2020 to the date of the first hearing in this case.  Father did not pursue a contempt action against Mother for her not bringing … Child to Canada from August of 2020 to February of 2021.  During this time[,] the Canadian border was open for child custody purposes.  Father resided exclusively in Canada from January of 2020 to January of 2021.  Father was in Antigua from January 3, 2021, until the end of March 2021.  In April of 2021, Father went to Lisbon, Portugal, and stayed there for two months.

Father was served with the termination petition on April 28, 2021.  After Father was served with the petition to terminate [his] parental rights, Father served Mother with a petition to modify custody and for contempt of the custody order….  Mother has never filed against Father for child support.  Father tried to pay support but claimed it is difficult. Mother has received child support from Father[,] but not on a consistent[] basis.  Prior to Mother['s] filing the petition to terminate Father's parental rights, Father had paid a total of $600.00 to support … Child over a period of two years.   Father's child support payments only became consistent after Mother petitioned for Father's parental rights to be terminated.  The payments came from Paternal Grandmother and not from Father.  Father never contributed to medical, dental,

---

[3] Father's Fiancé testified that she took it upon herself to research online the rules regarding automobile travel between Canada and the United States and that the travel restrictions in place at the time provided for an exception in custody cases.  **See** N.T. Hearing, 10/25/21, at 85-86 ("If you have documentation of custody[,] you're able to cross the border.").

[4] Father indicated that the border patrol informed him he could potentially fly into the United States, so he looked up the cost of flights to Washington, D.C. on his phone.  **See** N.T. Hearing, 8/23/21, at 189.  **See also id.** (Father's testifying that he "was told that actually we can't go to Washington because it was dangerous, someone got shot").

or optical insurance for … Child.  As of the date of the first hearing in this case, Father was earning $7,200.00 per month.  Father has a master's degree in sports psychology.  Father has worked for the NEAR Foundation[, a Swiss non-profit that is involved in blockchain,] since February of 2021….  According to … Father's Fiancé, as of October 2021, Father was applying to Temple University and was working on obtaining a student visa.

Father routinely smokes marijuana.  It is legal to do so in Canada.  Father made promises to Mother to come and visit … Child and then failed to appear for the visits.  Father's side of the family has historically been in and out of … Child's life.  Paternal [G]randmother was abusive to Father.  For this reason, Mother does not want … Child to be alone with [P]aternal [G]randmother.  Paternal [G]randmother has thrown hot pans across the room out of anger while … Child was present.  During the peak of the Covid-19 pandemic[,] from March of 2020 until the August 23, 2021[] hearing, Father traveled frequently to Antigua and Portugal.  Father never informed Mother of his travels.  Mother found out about Father's travels via social media.  Father blocked Mother from his social media after Mother filed the petition to terminate his parental rights.  Prior to the petition … being filed, Father and Mother communicated via Facebook [M]essenger and email….  Father has sent packages to Mother's address.  Presently[,] Father and Father's Fiancé reside in Harrisburg, Pennsylvania, where they are renting a two[-]bedroom apartment.  Father never informed Mother that he … relocated to Harrisburg….

Child was two years of age when Stepfather entered his life….  Father was always aware of Stepfather's role as the father figure for … Child.  Father is grateful that Stepfather is present to be a father to … Child.  Stepfather works part-time and is able to perform many parental duties on behalf of … Child.  Mother and Stepfather's family has [*sic*] dinner together a few times per week.  The dinners include Stepfather's extended family and Mother's extended family.  Stepfather believes it is important for … Child to recognize him as his legal father because he is with him every day and he performs parental duties for … Child.  Father believes Mother is an amazing parent to … Child.  Mother and Stepfather do not disparage Father to … Child.  Mother and Stepfather are a very close family.  They communicate well and focus on the two children in their home.

In the past, Mother had a working cell phone number for Father.  As of August 2021, Mother did not have a cell phone number for

[him]…. Mother knows Paternal Grandmother, Paternal Grandmother's address, and has been to Maternal Grandmother's residence. If Father's parental rights are terminated, Mother would permit contact between the paternal grandparents and … Child. Father's family knows how to communicate with Mother. Father has known Mother's address at all times since Father and Mother separated. Father had the ability to contact … Child before and since the filing of the [termination] petition…. Father was aware that he was failing to establish a relationship with … Child. Father has failed to demonstrate the stability necessary for … Child to flourish. Father admits that his parenting is inadequate. Father admits that he was never with … Child enough to be able to be a parent to [him]. Father has done nothing to improve his parenting for … Child. Father never asked for additional periods of physical custody of … Child or for his periods of physical custody to be unsupervised. There is no bond between Father and … Child….

Father has had no contact with … Child for a period in excess of six months preceding the filing of the [termination] petition…, nor has Father performed any parental duties ever. Father's last physical visit with … Child was [in] December of 2019[,] and his last communication with … Child was [in] July of 2020. The [GAL] indicated that, due to the lack of time Father has spent with … Child, there is no relationship with Father from … Child's perspective. [The GAL perceived] no harm to … Child in severing the relationship that does not exist between Father and Child.

Orphans' Court Opinion ("OCO"), 3/22/22, at 5-18 (paragraph numbers and citations to record omitted; some paragraph breaks omitted).

On January 27, 2022, the orphans' court entered a decree granting Mother's petition to involuntarily terminate Father's parental rights to Child pursuant to 23 Pa.C.S. § 2511(a)(1) and (b), and directing that the custody of Child remains with Mother and Stepfather. On February 24, 2022, Father filed a timely notice of appeal, along with a Pa.R.A.P. 1925(a)(2)(i) concise statement of errors complained of on appeal.

Herein, Father presents the following questions for our review:

1. Whether the [orphans'] court's decision to terminate Father's parental rights is supported by clear and convincing evidence and did not constitute an abuse of discretion where:

   a. The evidence was insufficient to establish a failure to perform parental duties for a settled purpose of relinquishing parental rights;

   b. The court did not properly consider Father's explanation for his conduct;

   c. The court did not have sufficient information as to the effects of the termination of Father's parental rights on … Child and the bond between … Child and Father; and

   d. The court did not properly consider the custodial parent's deliberate creation of obstacles and erection of barriers by devious means to impede Father's free communication and regular association with … Child.

Father's Brief at 4.

We review a decree terminating parental rights in accordance with the following standard:

> When reviewing an appeal from a decree terminating parental rights, we are limited to determining whether the decision of the trial court is supported by competent evidence. Absent an abuse of discretion, an error of law, or insufficient evidentiary support for the trial court's decision, the decree must stand. Where a trial court has granted a petition to involuntarily terminate parental rights, this Court must accord the hearing judge's decision the same deference that we would give to a jury verdict. We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence.

*In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009) (quoting *In re S.H.*, 879 A.2d 802, 805 (Pa. Super. 2005)). Moreover, we have explained that:

> The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."

- 8 -

*Id.* (quoting *In re J.L.C. & J.R.C.*, 837 A.2d 1247, 1251 (Pa. Super. 2003)).

The trial court is free to believe all, part, or none of the evidence presented

and is likewise free to make all credibility determinations and resolve conflicts

in the evidence. *In re M.G.*, 855 A.2d 68, 73-74 (Pa. Super. 2004). If

competent evidence supports the trial court's findings, we will affirm even if

the record could also support the opposite result. *In re Adoption of T.B.B.*,

835 A.2d 387, 394 (Pa. Super. 2003).

We are guided further by the following: Termination of parental rights

is governed by section 2511 of the Adoption Act, which requires a bifurcated

analysis.

> Our case law has made clear that under [s]ection 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [s]ection 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to [s]ection 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S. § 2511,

other citations omitted). The burden is upon the petitioner to prove by clear

and convincing evidence that the asserted grounds for seeking the termination

of parental rights are valid. *R.N.J.*, 985 A.2d at 276.

With regard to section 2511(b), we direct our analysis to the facts relating to that section. This Court has explained that:

> Subsection 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. In **In re C.M.S.**, 884 A.2d 1284, 1287 (Pa. Super. 2005), this Court stated, "Intangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." In addition, we instructed that the trial court must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond. **Id.** However, in cases where there is no evidence of a bond between a parent and child, it is reasonable to infer that no bond exists. **In re K.Z.S.**, 946 A.2d 753, 762-63 (Pa. Super. 2008). Accordingly, the extent of the bond-effect analysis necessarily depends on the circumstances of the particular case. **Id.** at 763.

**In re Adoption of J.M.**, 991 A.2d 321, 324 (Pa. Super. 2010).

Instantly, we analyze the court's decision to terminate under section 2511(a)(1) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>> (1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.
>
> ***
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant

to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to section 2511(a)(1).

To satisfy [s]ection 2511(a)(1), the moving party must produce clear and convincing evidence of conduct sustained for at least the six months prior to the filing of the termination petition, which reveals a settled intent to relinquish parental claim to a child or a refusal or failure to perform parental duties.

*In re C.M.S.*, 832 A.2d 457, 461 (Pa. Super. 2003) (quoting *Matter of Adoption of Charles E.D.M., II*, 708 A.2d 88, 91 (Pa. 1998)). In *C.M.S.*, we further acknowledged the following statement by our Supreme Court:

There is no simple or easy definition of parental duties. Parental duty is best understood in relation to the needs of a child. A child needs love, protection, guidance, and support. These needs, physical and emotional, cannot be met by a merely passive interest in the development of the child. Thus, this [C]ourt has held that the parental obligation is a positive duty which requires affirmative performance.

This affirmative duty encompasses more than a financial obligation; it requires continuing interest in the child and a genuine effort to maintain communication and association with the child.

Because a child needs more than a benefactor, parental duty requires that a parent 'exert himself to take and maintain a place of importance in the child's life[.']

*C.M.S.*, 832 A.2d at 462 (quoting *In re Burns*, 379 A.2d 535, 540 (Pa. 1977)).

- 11 -

Instantly, Father claims the evidence was insufficient to establish the orphans' court's finding of a failure to perform parental duties and/or a settled purpose of relinquishing parental rights, "because the court did not properly consider Father's explanation for his conduct and did not properly consider the custodial parent's deliberate creation of obstacles and erection of barriers by devious means to impede Father's free communication and regular association with … [C]hild." Father's Brief at 13. For instance, Father asserts that Mother attempted to prevent and/or limit his FaceTime communication with Child by denying him the ability to speak with Child if she felt the calls were too early or too late, if she was too busy, or if Child did not want to talk. *Id.* at 18-19. In July of 2020, Father alleges that Mother told him he was disrespecting Child and that she was not going to respond to any messages about him talking to Child, which he claims "made it impossible for him to communicate with … [C]hild." *Id.* at 19. Additionally, Father states that Mother insisted on being present for his custodial periods in contradiction with the custody order,[5] and that she refused his proposal to meet at a halfway point between York, Pennsylvania and Canada. To appease Mother, he agreed that his periods of physical custody would alternate between Mother and Child going to Canada and him traveling to Pennsylvania. *Id.* at 20.

_____

[5] After Father's initial visit with Child as outlined in the custody order, the order provides that "Mother's presence is welcome, but not required" for Father's future periods of partial physical custody. *See* Stipulated Order for Custody, 4/13/18, at 5 ¶A.

Father insists that he exercised "reasonable firmness in overcoming the obstacles and barriers Mother put in place." *Id.* at 22. He states that he continually voiced to Mother his request to speak with Child and that he even went as far as paying for Mother's transportation costs to bring Child to Canada, even though the court order stated that transportation costs should be split. *Id.* at 21. He further claims that he wanted to resolve his custody issues with Mother without further court involvement, because he "had genuine concern for the health and wellbeing of … [C]hild." *Id.* at 22.

Finally, Father argues that the orphans' court failed to consider his explanation regarding his not being able to travel to visit Child in August of 2020, due to Covid-19 restrictions. *Id.* In support of his argument, Father points to his testimony where he recalled attempting to drive from Canada but was turned around at the border. *Id.* (citation omitted). He further explains that he chose not to fly because of the risk of exposure to the Covid-19 virus during a flight and that such exposure could put Child at risk. *Id.*

Father has failed to convince us that he is entitled to any relief on this claim. Based on the following thorough and well-reasoned explanation in support of its decision to terminate Father's parental rights under section 2511(a)(1), we believe the orphans' court carefully considered and properly weighed all the evidence presented at the termination hearings:

> Father's last physical contact with … Child was in December of 2019. Father's last communication with … Child was in July of 2020. The six[-]month[] period preceding the filing of the petition ran from August of 2020 to February of 2021. It is undisputed Father had no contact during that period and consequently Father

- 13 -

performed no parental duties. "Although it is the six months immediately preceding the filing of the petition that is most critical to the analysis, the court must consider the whole history of a given case and not mechanically apply the six-month provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination." *In re B., N.M.*, 856 A.2d 847, 855 (Pa. Super. 2004), *appeal denied*, … 872 A.2d 1200 ([Pa.] 2005) (citing *In re D.J.S.*, 737 A.2d 283 (Pa. Super. 1999)[).]

A custody order was issued October 30, 2017, and subsequently a stipulation was issued on April 30, 2018, which granted Father one week of physical custody of … Child per month in Canada with Mother present. Father saw … Child in April, May, August, September, and December of 2018. Thereafter, there was one last contact on December 31, 2019. The record reflects that Father has never parented … Child. Father's off-sung refrain excusing his failure to exercise periods of physical custody was the Covid-19 restrictions resulting from the pandemic. But the record confirms that Father traveled to Antigua and to Portugal whenever called upon to exercise what was best for his personal interests while Father simultaneously ignored … Child. Credibility is lacking in many aspects of Father's testimony, but the August 2020 border incident where Father claims he was turned away due to Covid restrictions is perplexing. Other testimony indicated that border crossings were consistently permitted where the purpose of travel was to effectuate child custody visitation. It was during that same time Father could have flown to Washington, D.C., to see … Child, but he chose not to. The record supports a finding that Father chose a self-imposed estrangement from … Child for a period far exceeding six months and that Father neither asserted a parental claim to … Child[,] nor did Father perform parental duties.

As the evidence establishes a failure to perform parental duties and a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to [s]ection 2511(b). *In re Z.S.W.*, 946 A.2d 726, 730 ([Pa. Super.] 2008).

- 14 -

Father suggests that Mother was on a path of parental alienation and prevented Father from seeing … Child. In the event a parent sets up roadblocks for the non-custodial parent, the parent lacking custody must attempt to overcome any such impediments. "A parent must utilize all available resources to preserve the parental relationship and must exercise reasonable firmness in resisting obstacles placed in the path of maintaining the parent-child relationship." *In re C.M.S.*, 832 A.2d 457 at 462 [](citing *In re Shives*, … 525 A.2d 801 ([Pa. Super.] 1987)[)]. Parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her physical and emotional needs.

There is nothing in the record to show that Father used any of the means available to him to build and preserve his relationship with … Child. There was a custody order in effect, but Father did not seek to enforce the custody order except when he reacted after Father was served with the petition to terminate parental rights.

After his separation from Mother, Father was supposedly going to Utah to live. That did not happen. Rather, Father moved to Canada and then pursued various endeavors in Portugal and in Antigua. He also pondered his gender identity and took up with a new paramour. Father focused solely on his personal needs while he neglected … Child. "Parental duty requires that the parent act affirmatively with good faith intent and effort, and not yield to every problem, in order to maintain the parent-child relationship to the best of his or her ability, even in difficult circumstances." *See In re B., N.M.*, 856 A.2d [at] 855 …[.] Father failed to even attempt to establish a parent-child relationship long before the advent of the Covid-19 pandemic and its resulting confusion and travel restrictions.

Father alleges that the court erred in not properly considering Father's explanation for his conduct in relinquishing his parental rights or in failing to perform parental duties. This is a nebulous and dubious claim. Father's testimony was not credible. The Covid-19 restrictions did not present a roadblock preventing Father from being a parent. Father made no effort to be a parent before the pandemic began or since. Mother did not set up obstacles that prevented Father from seeing … Child. Father exercised no diligence in attempting to see … Child. As referenced above, Father focused on his own self-interest pursuits while he neglected his responsibilities to … Child.

- 15 -

OCO at 21-25 (some paragraph breaks omitted). After careful review, we conclude that the orphans' court's determinations are well-supported by the record, and we discern no abuse of discretion.

As for the analysis under section 2511(b), Father claims the orphans' court lacked sufficient information as to the effects of the termination of his parental rights on Child and the bond between Father and Child and, thus, it erred in finding that it was in Child's best interest to terminate his parental rights. Father's Brief at 23. He fails, however, to develop his argument. Father does not cite to a single case in support of his position. Moreover, he does not claim to have an emotional bond with Child, nor does he explain how the termination of his parental rights would negatively impact Child. Rather, he merely asserts that "in [M]other's own statements," she said Child knows Father, that Child sometimes addressed Father as "'Dada,' signifying some association to Father in … [C]hild's mind[,]" and that the orphans' court failed to consider the FaceTime communication and visits Father had with Child in reaching its determination. *Id.* Thus, we deem Father's claim regarding the orphans' court's findings under section 2511(b) to be waived. *See* Pa.R.A.P. 2119(a); *Estate of Haiko v. McGinely*, 799 A.2d 155, 161 (Pa. Super. 2002) ("Without a reasoned discussion of the law … our ability to provide appellate review is hampered. It is not this Court's function or duty to become an advocate for the appellant.") (internal quotation marks and citation omitted).

Nevertheless, even if Father had not waived this issue, we would conclude that his claim is meritless. In support of its decision to terminate

Father's parental rights under section 2511(b), the orphans' court emphasized that Child does not really know Father and concluded that "[i]f there is no bond, there can be no harm in severing something that does not exist." OCO at 25. The GAL agreed that "Child does not know Father, thus there is no bond or relationship to be severed." GAL's Brief at 10. In addition, the GAL observed that "[i]n consideration of … Child's young age, the passage of time since … Child had spoken to Father prior to the filing of the petition, and the parental relationship that … Child has with Mother and Stepfather, there will be no disturbance to … Child's life or comfort by terminating Father's parental rights." *Id.* Finally, the orphans' court noted that "[t]he only family … Child knows is Mother and Stepfather and their families. All of … Child's needs are met in the home Mother and Stepfather provide. [] Child deserves to remain undisturbed with his family." OCO at 25.

As there is competent evidence in the record that supports the orphans' court's credibility and weight assessments regarding Child's needs and welfare, and the absence of any bond with Father, we would conclude that the court did not abuse its discretion in terminating Father's parental rights under section 2511(b). *See In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) (stating that appellate courts must defer to the trial court regarding credibility determinations and weight assessment, so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion).

Accordingly, we affirm the decree involuntarily terminating Father's parental rights to Child, pursuant to 23 Pa.C.S. § 2511(a)(1) and (b).

Decree affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/16/2022